Good morning. May it please the Court, Attorney Daphne Barbee, on behalf of Vatican, and you did get the pronunciation correct. I represent Mrs. Batican, who is the appellant and who was a salesperson for Reliant Pharmaceuticals. Prior to being a salesperson with Reliant Pharmaceuticals, she worked for Ventive Health USA. And Reliant purchased or bought out a contract, through contract, the employees of Ventive USA. And when Reliant bought the contract and the employees became employees of Reliant, they agreed, Reliant agreed, management agreed, that the time which Ms. Batican, a former employee of U.S. Ventive Health, would be grandfathered in for purposes of pregnancy leave and purposes of family medical leave, and that time would be grandfathered in and counted and accrued. And Mrs. Batican became pregnant, and in June, she negotiated with Reliant to take pregnancy leave. This pregnancy leave was approved and was entitled family leave and pregnancy leave, according to Reliant's own pregnancy leave slips. It was approved. She took it, had a complicated birth, childbirth, had hemorrhage and retained placenta. And so the pregnancy leave was also turned into a disability pursuant to Family Medical Leave Act. And she had an approved leave up until November 22, 2003. While she was out on leave in October, she was contacted by the human resource person, Donna Pacek, in New Jersey. Reliant has its headquarters in New Jersey. Contacted and told that she was terminated due to a reduction of force due to Reliant's financial  Dr. Michael Smitherly. Actually, we're familiar with the facts. You might move on to the argument. All right. We have, well, first of all, we argue, of course, that the district court erred in granting summary judgment. First of all, with regards to count six, the district court specifically as a matter of law ruled that our wrongful termination due to public policy claim was not valid as a matter of law. And I have supplied additional case law to you on that issue, because in the state of Hawaii, we do have wrongful termination as an independent tort. The district court specifically said that because we sued under Family Medical Leave Act, that, therefore, we had a remedy at law, and we could not have the wrongful termination as a separate count. Now, when I argued it to the district court. Kennedy. Hadn't the Hawaii Supreme Court held that termination because of public policy is part of the family medical leave act? No. And that's why I submitted to Your Honors today new case law, which, although there – let me just explain. Hawaii – the Hawaii Supreme Court has not ruled that there is no wrongful termination based on family medical leave. It has ruled that there is no wrongful termination based upon race and sex discrimination, but not on medical – family medical leave. Family medical leave is a separate act in Hawaii, which is Chapter 398. And the case that I provided you today, which is a Hawaii case, Chung v. McCabe, specific – it was decided in – didn't the Supreme Court of Hawaii hold that a claim for wrongful termination in violation of public policy cannot be brought where, quote, where the policy sought to be vindicated is already embodied in a statute providing its own remedy for its violation? Right. But it only held that with respect to the Ross case as a sex case, sex harassment. It is not family medical leave. Family medical leave is a separate statute in Hawaii. It's separate. And so there is no Hawaii law. There is a vacuum. And in fact, Judge King, in his opinion, acknowledged that there is a vacuum of law, that there is no law by the Hawaii Supreme Court which says that you cannot have a wrongful termination based on public policy, which uses family medical leave as its basis. And that's why I was arguing to Judge King that you should follow Liu v. Amway, which is a Ninth Circuit case, which says that you do have a separate tort for wrongful termination based on public policy issues for under the Family Medical Leave Act. I have also presented new case law for arguing in district court in Hawaii. Yes. Rather than follow a Hawaiian decision of the Supreme Court on a State law claim, a pendant jurisdiction claim, the court should follow a Ninth Circuit interpretation of a Hawaii law. No, I did not argue that. The argument was presented there is no Hawaii Supreme Court case decision specifically stating that you cannot have a wrongful termination based on public policy based upon the Family Medical Leave Act. And the district court judge acknowledged that there is a vacuum in the law. But the violation of family medical leave obviously allows for cause of action, right? That's correct. However the Stauffer case, as I understood it, said that where the statute provides for a remedy, then Hawaii will not provide a common law tort of wrongful termination against public policy. Am I missing something? Yes, Your Honor. You're missing the case of Chung v. McCabe, Hamilton, Rennie and Company, which I have given a copy today to you. It's a 2006 case from the Hawaii Supreme Court. That wasn't in your brief, right? That's correct. It's not in my brief. And so I did present it. Is that in your 28J letter? Yes, it is, Your Honor. I presented it today along with a copy of the case law. I have three cases cited here, Dowd, Washington and Chung. Right. It's the Chung. Chung v. McCabe. It's the only Hawaii case which I presented to you. And in this particular case, it had to do with, again, the wrongful termination and separate torts, defamation, false light of invasion of privacy. And the Hawaii Supreme Court stated that if Congress does not specifically state that the federal statute preempts state claims and that there's a specific congressional mandate, that, therefore, the independent tort claims should go ahead and proceed to trial and that they are not preempted. And in this case, it was the national court. And then it says that the NLRB, the Federal National Labor Relations Act Board, does not preempt state tort claims for false light invasion of privacy. That is correct. It doesn't. That's correct. But the Family Leave Act provides remedy for violation of the Family Leave Act. True. However, Your Honor, it does not provide for – it's not exactly the same as wrongful termination because the remedies are not the same. In the Family Medical Leave Act, you have liquidated damages, whereas in wrongful termination for public policy, the damage would include general damages, compensatory damages for pain and suffering, emotional pain and suffering and stress. And specifically, I also cited to – Maybe what Hawaii is saying is when the federal government provides a remedy under the Family Leave Act, that's all you get. I – there is no case law. The Hawaii Supreme Court has not so stated. Certainly, if the Hawaii Supreme Court did state it, we wouldn't have filed the case. But there is no – Preemptive. Preemptive. It is not preemptive. And I would use the arguments found in Dowd v. Avermeer in Washington v. Fort James Operating Company, which are – I've also given you copies of. But the reason it's not preemptive is that under wrongful termination cause of action, the remedies will allow for compensatory damages as opposed to liquidated damages. So the remedies are much broader, and they would allow for Ms. Bajikhan to claim for emotional stress and distress as a result of the wrongful termination. It would be part of the damages section. So that's very different from the Family Medical Leave Act. But that doesn't argue that it's not preemptive. Perhaps the federal government wants to preempt and limit – as bizarre as that might seem to you – limit the remedies. Well, I would respectfully disagree, because if the federal government did want to limit the remedies, it could have easily have said so, that no state is allowed to have its own statute. No state is allowed to change the remedies based upon its own law and its own statutes. And in this case, we don't have it. And Congress did not express an intent to state that the Family Medical Leave Act is, in fact, preemptive of all states. And, in fact, look at the Leo v. Amway case. You have California statutes which specifically are not – by this court were found not to be preemptive by the Family Medical Leave Act. So it would – so we have case law already, even in this circuit, stating that the Family Medical Leave Act does not preempt state statutes. But I'd like to move on to another issue, which is the issue of pretext. The court granted summary judgment in this matter. And it specifically – basically gave the employer carte blanche. Its reasons for terminating her were legitimate. And we submit that we have presented enough material issues of facts such that a jury should decide whether or not the employer's reason was, in fact, legitimate or not. And these are – Ms. Badecon, compared to the other remaining person who was kept on the payroll, sold less before she got pregnant, correct? No, that is not correct. Not correct? Bear in mind that Reliant – she became an employee of Reliant in April, okay? She was pregnant and had to leave in August, okay? Now, what Reliant says is that they looked at the last quarter, which would be April, May, or June, to decide whether or not she was selling more than the other lady, Leanne Newman, who, by the way, was not given pregnancy leave under Reliant, Ms. Newman, even though they argued to this court that she was given pregnancy leave. That's not correct. Ms. Newman was given pregnancy leave by Ventive, which is the prior employer. But getting back to your question, if you look at Defendant's Exhibit I, which is the last sales, comparative sales between Ms. Badecon and Ms. Newman, you will see there are two products which they were selling. One was Dinosaur CR, and one is Lexical CR. And if you look at Exhibit I, it shows that my client, Mrs. Badecon, sold more products in Dinosaur CR than Ms. Newman. At the same time, we'll concede, she actually sold 128 of Dinosaur, and Ms. Newman only sold 111 of Dinosaur. At the same time, we acknowledge that Ms. Newman sold more of Lexical product than my client, Ms. Badecon. But they didn't compare or didn't look at her entire record, sales record, which included Ventive USA, because, again, they only became employees of Reliant in April. And also, if you look, we also asked for discovery, in discovery, we asked for the records, because according to Reliant, her supervisor, and acknowledged by Reliant, her supervisor lived in Orange County, and it was a San Diego territory, and they had 12 other sales representatives, at least 12 other sales representatives. And we asked for statistics, because first they told Mrs. Badecon they were terminating her, because there was a financial downturn in business. Subsequently, if you find out that there's something wrong with that explanation, mainly because they kept on employees and hired new employees. And so when we asked for proof, how many employees have you hired after Ms. Badecon was terminated, in depositions, Donna Pacek and David Berggruen acknowledged hiring new employees and acknowledged having the records, but would not give this to us. Hired new employees in Hawaii? They did hire someone in Hawaii to replace Ms. Badecon, but that was not until 2004. Yes, sir. Wasn't there an offer made to Badecon to sign up again? No, there was not. January 29, 2004? Absolutely not, and that's something that we pointed out to the district court judge. It's in our concise statements of facts. It's the last item in Ms. Badecon's declaration. Absolutely not. She was not offered to come back to the job. It was not offered. You're not contending that the reduction in force of all of these employees was in order to get pregnant women and medical leave women in order to remove them? Is that your contention? With respect to Ms. Badecon, we do, we feel that there's enough evidence to present to a jury that their reason is pretextual, and here's why. There was another woman, Ms. Horton. What was pretextual? The fact that there was a reduction in force? Yes, we want to know. First of all, they say it was a reduction in force due to financial problems. If there was a reduction in force, why are they hiring, going from 750 employees to 1,010? In effect, you're saying that this reduction in force and the rehiring of people was in order to discriminate against your client? We're saying it's pretextual. Yeah. She was terminated while she was on pregnancy leave. I understand pretextual, but in actual practicality, you have to be saying that this reduction in force, for all the discovery you wanted, this reduction in force was really, the whole thing was pretextual, in order to get pregnant women and people on family leave and be able to terminate them? Well, in the case of Ms. Batikhan, yes, because if you're going to terminate people and say that you're terminating because of financial problems and then hire a lot of people, and then the people you terminate are pregnant or taking pregnancy leave, then that raises a question, a material fact, is this the right thing to do? Is this the real reason why you terminated Ms. Batikhan? You're going to say that she had lowest sales, but you're not going to provide us comparators of the other sales in the territory. Also, if you look at her evaluations, they are very good. I've included the evaluations in the package, but her evaluations are good. She hasn't been counseled for low sales before. So, yes, and also the fact that they have another pregnancy discrimination and family medical leave act saleswoman terminated two months before Ms. Batikhan by the same human resource person, Donna Pacek, and this is information Ms. Batikhan had to find on her own, because they told us in discovery that they had not been sued for pregnancy discrimination or family medical leave act discrimination before, but that wasn't true. So what we wanted was... One of the things that troubles me, just so you can answer it, is that 92% of persons who were terminated were not on any kind of leave, and half of the persons that were terminated were men. So I have a difficult time seeing how this whole thing works. Reduction in force was an effort to get rid of people that were pregnant or on family leave. I see where you're saying, but we don't, like I said, there was a variety of reasons given by Reliant, which caused red flags, if you will, as to the real reasons why Ms. Batikhan was terminated. There was a reduction in force really needed. How do we find this information out, through discovery? Is that a question that really should be before us, as to whether it was really needed or not? I believe before you, yes, the fact that a plaintiff is unable, in an employment discrimination case, is unable to get discovery, such as proof as to whether or not the reason given to Ms. Batikhan was, can be backed up, if you will. For example, when we asked for proof of financial difficulties, which is the reason she was told, we were not allowed to get this information, and when I did a deposition, Donna Pasek, who actually terminated Ms. Batikhan, said she didn't know, she didn't have that information, she couldn't remember. Let me ask the question this way. Do you really have to show that the entire reduction in force was designed in order to get rid of Ms. Batikhan and others who had taken advantage of the family leave pregnancy provisions, or do you merely have to show that there was an ongoing reduction in force, which for many employees might have been perfectly legitimate, but the reason for including her in the reduction in force was forbidden? Yes, I would agree with you. You only have to show the second. Right. I would agree with you on that. And how is the information you're seeking going to be relevant to that, as it were, narrower question? Okay. Well, first of all, with regards to the reason that they gave, we had to do a reduction in force due to financial reasons. That simply wasn't true. The deposition showed that the people who were the decision makers in terminating Ms. Batikhan had no proof of financial problems on Reliant's part. But also, Reliant didn't, they did a reduction in force, but they didn't do a reduction in force. They claimed they did a reduction in force, but they also did an increase in force right around the same time. They also added on, in addition to Lexgal and Dinosaur, a new product and hired new salespeople. So basically what you want is just to give us a lot of information from which we can figure out whether you're telling us the truth and whether or not there may be a legitimate inference that she was fired for forbidden reasons. Well, we can present it to a jury and let the jury decide whether or not. Well, that's just another summary judgment motion. Well, hopefully we'll be able to present it to the jury. It depends on what you find out. Yeah, exactly. My problem is really with the discovery request. As Judge Fletcher indicated, without the discovery request, we're looking at the question of whether she was actually discriminated against in this situation where there was a reduction in force. As opposed to the other persons. But the discovery request, I have a very hard time seeing how that could possibly be something that is justified in light of the fact there are so many people that are reduced in force and that, as I said, 92 percent of them were not on leave and half of them were men. The discovery doesn't seem to me to pertain to this particular claimant. All right. There were, if I may answer your question, there were four distinct discovery requests which were rejected by the magistrate judge and approved by the district court judge. With regards to the reduction in force, we asked for statistics. We didn't ask for names, statistics and dates of the employees who were hired. So if you have a company that does reduction in force, let's say of 100 people, but then at the same time they hire 200 people, is that a true reduction in force? So here we have a situation where they admit to hiring, because at the time Ms. Batacan worked for Reliant, there was 750. All of this was to somehow get rid of the pregnant people and people on family leave? Well, in Ms. Batacan's case it resulted in she was on leave, approved leave, and then she was terminated while she was on leave. And then what's interesting is she was terminated in October, but they backdated it to September, but in September she was still negotiating her period of leave and no one told her, oh, we're undergoing financial problems, we need a reduction in force in September. They did it in October and then backdated it. But getting back to your question, so in addition to asking for statistics on new hires, we also asked, and also some of the cases I cited in my brief state specifically that if you have a reduction in force, that plaintiffs should be able to find out whether or not they have hired new people as to establish a pretext to the legitimate business reason. Okay, why don't we hear from the other side? We've taken you over with our questions, so we'll give you a minute to reply. May it please the Court? My name is Barry Marr and I represent Reliant. I think key to some of the discussion this morning has been when did Reliant make hiring decisions? And I would like to refer the Court to excerpt of record at pages 177 and 178. That's a portion of the deposition of Donna Pacek, and that's where she discusses the hirings that have occurred. And specifically she states that on April 1st of 2002, when Reliant took over the sales force, they had a breakdown of the number of employees, about 750 employees. In September of 2002, five months later, when they had the layoff, they had about 750 employees, less the 69 that they laid off. What is key is when they went to 1,100, because the brief, the opening brief at page 33, suggests that they went to 1,100 within a couple of months after the layoff, but that isn't true. It's clear from Ms. Pacek's deposition that that increase in hiring was as of the date of her deposition, which was October of 2004. Well, but as I read that, she says, well, now, October 2004, we have 1,100, but that doesn't say when they were hired. It just says now that's how many we have. So it's entirely consistent, as a logical matter, with what she said, that, well, we reduced on September 13th by 69 people in 2002, and as a logical matter, it would be entirely consistent that, well, they went up to 1,100 the next month. I don't see the, I don't see the, that is a logical, logical. Well, no, I'm saying we know two points. We know that they were hired in September of 2002, and we know what the situation is in October of 2004. That's correct. And we have no information in between. There is one additional piece of information, which also is from her deposition, and that's that in December of 2003, they brought out a new product, and as a result of the new product, they increased their hiring by about 125 employees. And that is where in the deposition, if I put my nose in it, that that also is on those same two pages. So if you can just direct me straight to it, that'll be useful to me. I apologize. I don't have it here in front of you. OK, so we move from what, 750 minus 69. So call it, roughly speaking, just under 700 to 1,100, and we add how many when the new product comes out? 125. That leaves about 275 unaccounted for. That's correct. Yeah. So there's some blank spots. There are. That's true. And if they were all hired within two months of the RIF, of the reduction in force, that works against you? It would, but there is no evidence that there was any hiring that occurred immediately after. And why is there no evidence? Because we didn't get discovery? Well, it, you know, I think the answer is yes, but we didn't get discovery. There was a lot of discovery provided, but it was provided as to the Hawaii market, because the decision between Bannekan and Newman was made only in Hawaii. The manager was told to reduce the Hawaii staff by one, and there were two. They measured the sales performance for a given period of time, a three-month period of time, when both employees were fully and actively employed, and that's the same three-month period that they used across the country throughout their whole sales force. And their analysis was that Bannekan came out second. With respect to Lesthal, her achievement was 53 percent of goal, whereas Newman's was 65 percent. With respect to the second product, Bannekan's achievement was 87 percent of goal, whereas Newman, also a female and also a female who had recently been on pregnancy leave, was 95 percent. Now, that doesn't seem to me consistent with what I just heard, that with respect to two different products, one product, Ms. Bannekan, sold more. How can I reconcile those two statements? She may have sold more. What they went on was percentage of goal. So the goals maybe were different for the two salespeople? Could have been different. They could have been? As I stand here, I don't know for sure, Your Honor. I was surprised to hear what counsel said, but it could be because the goals were different, but I don't know. Because at first blush, I hear, as to one product, she sold more, and then you tell me, but as to both goals, she was inferior. There's a glitch here I don't get. The only explanation I can offer is that it could be that they had different sales goals because they did have different territories. So she could have sold more of the product, but not reached her target goal. But is that going to be on the record if I look hard enough, or do you know? I don't know, Your Honor. We did, though, respond to all discovery requests that were made, but we did limit our responses to the Hawaii market, and then later we supplemented it with the same region with respect to certain information, and that information was FMLA issues and examples of pregnancy discrimination. I would like to note also... Again, I've got a glitch with what you just said. You say you responded to all discovery requests that were made? We did. And what are these motions to compel that were denied then? Weren't those discovery motions? She expanded them to include nationwide discovery. Oh, in other words, you didn't respond to all discovery requests that were made. You responded to all Hawaii-specific discovery requests that were made. Is that what you meant to say? We provided a response. Part of our response was that we provide the information, but we're only providing it for Hawaii because that was the unit that the decision was made. That was the unit that you regarded as relevant for purposes of the decision. That's correct. And then she moved to compel for the nationwide information. You opposed that on the grounds that that was burdensome and harassment and irrelevant, and the judge sustained you. That's correct. Both the magistrate judge and also the district court judge. And was there sort of an intermediate position with respect to the discovery request that would have been within the particular sales district? We did... Which I gather was centered in San Diego. We did provide information that she requested with respect to FMLA issues and pregnancy discrimination claims to the wider region, which included Hawaii, California, Washington, Oregon, and Nevada. But other than statistical evidence, you didn't outside of Hawaii. Correct. Was there a request made that was not nationwide with respect to statistical evidence that was merely sort of, I don't know whether it's called sales region or sales district in the terminology your company uses? She did request it for the region as well as nationwide. And you didn't want to respond to that either. You said, no, we're only going to answer those statistical questions with respect to Hawaii. That's correct. And the statistics were two people. That's correct. And the decision was made as between those two people. In other words, it wouldn't have mattered how Batakan did with respect to her counterpart in California because that was a different group and the company looked to Hawaii separate from how it looked to the different group. I would like to add also that there's no evidence of any circumstantial evidence of any discriminatory animus on the part of the company with respect to pregnancy or FMLA. When the company hired her in April, it knew that she was pregnant. She requested leave. It was immediately granted. She then had to go out earlier than anticipated and the leave was immediately granted to cover it. She then had to ask for an extended leave because she did have complications. And again, the company immediately granted it. There were suggestions that we backdated her termination. That's just simply not true. What happened was that in September of 2002, when the layoff decision was announced as to most of the employees, there were five employees who were on leave. With respect to those, if they were on paid leave, the company ran their leave until the paid leave had concluded and then notified them of the reduction in force. They actually treated them more favorably than the FMLA requires that they be treated. They could have been severed in mid-September, but Ms. Vatican, as well as the other four who were on leave, their paid leave was continued to run until it expired. With respect to the issue of whether Hawaii has a wrongful discharge cause of action, we clearly do. It was created by the Hawaii Supreme Court in the Parnar case, and it was later limited by the Hawaii Supreme Court in the Ross case. And in the Ross case, the Hawaii Supreme Court stated that where you have a remedial structure within the statute that provides a remedy, that it wasn't appropriate to also have a common law remedy. It's true they did not make that decision with respect to FMLA or pregnancy discrimination, but as I read the case, and I think a fair reading of the case, is that it applies across the board to any claim that might have a remedial structure within it. If there are no further questions. Yeah, I have a concern about the discovery. Maybe you can elaborate a little bit more about discovery was denied for the nationwide, and was it denied for any other part? I believe she did request information on a regional basis, and we did only provide it for Hawaii, except for the issues addressing FMLA and pregnancy discrimination. So when it was provided for Hawaii, how many people did that involve? It would have only involved between two and three people. When they commenced employment on April 1st of 2002, they had three employees. Prior to September, when the layoff was made, one of those three employees, who was a male, left the company. So it was done for those two. The region that she wanted, you enumerated which states. What were they again? It was California, Washington, Oregon, Nevada, and Hawaii. Sounds like the Ninth Circuit. How many people were involved there? There was a smaller group within that region that operated out of her direct manager, Mr. Burgoyne. He was in Southern California. There were approximately 40 representatives in that group. I don't know how many there were outside of that smaller group. Forty in California? Correct. Southern California. Just Southern California? Correct. Because the region doesn't extend to the north? Well, he was based in San Diego. Who was based? Mr. Burgoyne. He was Batacan's direct supervisor. And the reason that that information was in the record was because of the FMLA analysis on whether there were 50 employees within the employment site. And the record shows that there were 41 employees within the 75 miles of Burgoyne's employment site, which was his home. I can understand why not the nationwide reduction force. I have a harder time understanding why there was a reluctance to provide this discovery for the region. Well, the appellant has not demonstrated that there was an abuse of discretion, which is the standard that would be applied to a district court's discovery order. And there's no indication that providing that information would have made any difference in the motion for summary judgment. The reason it wouldn't have made any difference is because with respect to Ms. Batacan, she was compared against one other employee, and that other employee was Newman, who was also in Hawaii. And that's why we limited it. What if in the region there were a whole lot of people that were on pregnancy leave or family leave, and this would be showing that it was not, it was protectual? Well, there's no evidence in the record. But that's the problem, right? Well, I mean, it's... In answer to Judge Hugg's question, in your second response to discovery, as to other discrimination lawsuits, you didn't just answer as to Hawaii. You answered also as to Mr. Ruffin's region, which consisted of Hawaii, California, Washington, Arizona, Oregon, Idaho, and Nevada. But what you didn't, you didn't use a broader region as to the economic downturn evidence because you were concerned with Hawaii and Hawaii only, right? That is correct. When you say that you responded on a region-wide basis for a Family Medical Leave Act request, and it was one other request? Pregnancy discrimination. Pregnancy discrimination. What was the nature of that information? Part of it was simply how many employees are there, and therefore is there coverage under the Act. Was there other information that you provided? I believe what she requested was whether there were other claims or other litigation, and there was none. And what was the claim that she describes that was a termination by the same supervisor? Was that outside the region? Yes, that was in Ohio. Did you provide other Family Medical Leave Act and Pregnancy Act information than filing of claims on a region-wide basis? Only on the region-wide basis, which was the Western United States. I'm sorry, I asked the question awkwardly. It's not your fault, the response you gave. I understand that it was on a region-wide basis, and I understand it was with Family Medical Leave Act and Pregnancy Act, but I want to know is what information were you asked to supply and what information did you supply? I've heard you say that you were asked what claims or lawsuits had been brought against the company under those two Acts. Was there anything else that you supplied? I don't believe there was, Your Honor. I see. So you didn't provide any statistics for those regions. All you did was, we don't have any claims. Correct. With respect to the statistics, again, Ms. Badakhan did not go head-to-head with anybody in the Western region. The analysis was for Hawaii and Hawaii only. They determined to lay off one person in Hawaii, and that's why we provided the statistics for Hawaii. But what bothers me about this is that if there is a pattern within the region of some form of forbidden discrimination, that pattern will not necessarily be revealed by the filing of claims. I mean, there are lots of people who, for various reasons, don't file claims. They don't know they have a claim. It's difficult to file, you know, all kinds of stuff. So it could be, I mean, I don't know, it could be that there is evidence in the pattern in the region that would support her allegation that this was pretext. Is that possible? It's possible. I think the precedent that we cited, and it's around page 48 of our brief, indicates that it's typical to provide the evidence for the employing unit. And here the employing unit was Hawaii. Yeah, you see, I can understand both sides on this one. This is a tough case because you don't want somebody cut out of discovery. Rule 26 is pretty broad. Not only relevant evidence, but evidence that might lead to relevant evidence. I mean, that's Rule 26. And then after they've asked for something that's even, I mean, I'm now not talking nationwide, but I'm talking within the sales region. They ask for statistical evidence that might lead them to something. They're not given it. And then they're told at summary judgment, well, you don't have any evidence. Boy, that's a little, that cuts it pretty fine for me. On the other hand, I'm sympathetic to the company that, you know, you shouldn't have to sort of open up your files for everything. And, you know, had we made the decision, had the region been said, within this entire region you have to eliminate 15 positions, I think it would have been fair then for us to provide all of the evidence for that region. But where the directive was very specific, it was to Hawaii. And we're, you know, we're 2,500 miles away from the mainland. And it's just not realistic in a company who's trying to save costs to then decide, well, we're going to transfer somebody from California to Hawaii. Well, I understand that part. What I'm after is, but if there's some pattern within the region where, and I'm totally making this up, this is not a charge against you or against your company. But if there's some evidence in the region that we have somebody who's the head of that region, not nationwide, but just in the region, who says, well, I want to get rid of underperformers. And my definition of underperformers is, okay, how much money do I put out in terms of salary versus how much do I get back in terms of sales? And on that definition, somebody who's out on pregnancy leave is an underperformer. I want them all out of here. Well, that doesn't go to the question of whether you're going to transfer somebody from Hawaii to the mainland. It goes to, well, what are they really doing? Now, I admit I totally made up that scenario. I have no evidence whatsoever that your company came even remotely close to that. But I would think that would be relevant evidence if it existed. I think the question on appeal is whether there was an abuse of discretion by the magistrate judge and the district judge. Was that kind of demand and discovery actually made? Because my notes indicate that the first demand was to rely on produced coaching plans for the professional sales representatives in San Diego district. The second demand was that any other discrimination lawsuits as to which you responded on a region wide basis. The third demand was records showing a downturn in business, which you respond to on a Hawaii basis. And the fourth one was a list of positions and rehires after the reduction in force, which you responded to in a Hawaii position. Was there ever a demand for statistical evidence such as it was inquired into in that last hypothetical? I don't believe there was. It was either nation. It was nationwide that that request was made. Maybe rebuttal Miss Barbie can tell us what was what request that was and what citation of the record shows. Thank you. Thank you. Thank you very much. Response. Could you answer that last question? Oh, OK. I actually was doing research to Donna Pasek's response to the new hires. But yes, I did ask for the territory of San Diego. It's for what? What did you ask for? San Diego, the coaching plans. I asked for the coaching plan evaluations and information showing statistically who had the lowest sales, because that was one of the reasons after Miss Bata can filed her discrimination complaint. They said, well, in addition to reduction of force, you had the lowest sales. She was never told that by Donna Pasek when she was terminated. But after she filed her suit, she was told that Reliant said, well, you had the lowest sales. So we did a pardon me, a paid citation to the record in which you say that you asked who had the lowest sales in San Diego. On the San Diego territory or evaluations. Yes. I wanted to see the coachings and evaluations of the sales people in the San Diego territory, which Miss Bata Khan was assigned to. But she was in the region that included San Diego and other states. It included Hawaii. Yes. Hawaii, California, Washington, Arizona, Oregon, Idaho, Nevada. Right. But you only asked about San Diego and you asked for more than coaching plans in San Diego? For the San Diego territory. Yeah. Not San Diego City, but for the territory. I'm sorry. And when you say San Diego territory, you're referring to this region. Yes, I am. And I'm very interested in the answer to Judge Breyer's question in terms of what exactly did you ask for with respect to the San Diego region? With regards to requests for production of documents, produce all coaching evaluations for all sales representatives of David Bergun. And David Bergun was the sales manager for San Diego territory. And that is on my motion to compel discovery, if I could get the docket number. That was fine. The coaching evaluations in Bergun's region. Yes. And what do we mean by coaching evaluations? Or is it coaching and evaluations? Help me understand what that is. Okay. Coaching evaluations are, I believe, examples that are contained in the record, I think, as Exhibit 15, which was a coaching evaluation of Elaine Batucan. And then we also included the coaching evaluation of Leanne Newman. Coaching evaluations are done by David Bergun, who was the sales manager, who would say whether or not they're doing a good job in their sales or criticizing them in their sales presentation. Coaching evaluations wouldn't show termination account pregnancy, would it? Pardon me? No, they would not show that. However, if they're going to say that Ms. Batucan was the lowest sales in the regions, certainly if other sales representatives had worse evaluations, that would establish a pretext to their reason with respect to Ms. Batucan. Even if they were in Nevada or Oregon or Idaho? Yes, because they're saying she was the lowest in the region. That's what they said. So if we show that someone else who was lower in sales than she was and who was not terminated in this reduction in force, then we could argue that their reason was pretextual. So lowest in terms of lowers related to goal, sales goal. I would look at sales goal as well as sales. I would look at both. Sales, I think, in San Diego might be more greater quantity than sales, say, in Idaho. I don't know. I would like to take a look at the figures on that. Okay. That's something I really would not know until I actually see the figures. She was told that she was terminated because, not because she was the lower of the two in Hawaii, but because she was the lowest in the entire region? Yes, she was told after, well, first she was told there was a reduction in force due to financial problems. Then when she found out they were hiring new people and had a new product, then she was, and she filed a complaint. Then she was told, well, you were terminated because you had the lowest in the territory. And so we wanted to see, there was various explanations given at various times by Reliant for terminating her. I just want to address a couple more questions that were asked, if I may. One was the question of the new hires, when they took place, and where in the deposition. Donna Pasek talked about the new hires and when they took place. There is, on page 33, I questioned her in deposition is who made the decision, when, oh, sorry, that's the wrong page. I'm sorry. Okay. Page 65. Were there new hires in Hawaii? There was a new hire in Hawaii, but it was in 2004. There was a new hire, yes. And they did not offer Ms. Batacan, the job. But page 65 of Donna Pasek's deposition, I asked her, when did Reliant hire new employees after Ms. Batacan was terminated? And she said, I don't know. And she said, I would venture a guess that we may have hired, I said, was it with, you know, when was it? I don't have this information. Is it available? Yes, it is. It's in my human resource database. And I asked for that information from Reliant, and they said they would not give it to me. There may have been more questions that you had about the facts in the records. Specifically, I think there was a question about my asking about lawsuits and claims on pregnancy and family medical leave. The answer that I got back from Reliant was, no, there had not been. And then we subsequently found out that there was, in fact, a termination and a lawsuit brought by a pregnant sales employee. In Ohio, is that correct? True. And had your question been nationwide? Yes, it was nationwide. The response, they chose to respond only for Hawaii. But the question was nationwide. But what's interesting about this particular case that was found independently is that the lawsuit question was responded by Bob Ruffin's region, which was the whole region, not just Hawaii. Right. Right. Bob Ruffin's is the whole region. Correct. Okay. But if I may, Donna Pasek was the same person who terminated the woman in Ohio. Okay. Thank you very much. Thank both sides for their argument. The case of Barakan v. Reliant Pharmaceuticals is now submitted for decision.
judges: Hug, W. Fletcher, Bea